1
2
3
4
5
6
7
8
9
10              UNITED STATES DISTRICT COURT
11             SOUTHERN DISTRICT OF CALIFORNIA
12
13   VICTORIA WONG,                    )   Case No. 12-cv-2917-L(MDD)
                                       )
14                    Plaintiff,       )   **FINDINGS OF FACT AND**
                                       )   **CONCLUSIONS OF LAW**
15   v.                                )
                                       )
16   AETNA LIFE INSURANCE COMPANY,     )
                                       )
17                    Defendant.       )
                                       )
18   _____ )
                                       )
19                                     )
                                       )
20                                     )

**I.    INTRODUCTION**
21
22        Plaintiff brings this action for disability benefits under the Employee Retirement Income
23   Security Act of 1974 (ERISA).  Under ERISA § 502, a beneficiary or plan participant may sue in
24   federal court "to recover benefits due to him under the terms of his plan, to enforce his rights
25   under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."
26   29 U.S.C. § 1132(a)(1)(B); *see also CIGNA Corp. v. Amara*, 131 S. Ct. 1866, 1871 (2011).
27        Under ERISA, plaintiff is entitled to a bench trial on the administrative record.  *Kearney*
28   *v. Standard Ins. Co.*, 175 F.3d 1084 (9th Cir.) (en banc), cert. denied, 528 U.S. 964 (1999).

Federal Rule of Civil Procedure 52(a)(1) provides that:

> In an action tried on the facts without a jury ..., the court must find the facts specially and state its conclusions of law separately.  The findings and conclusions may be stated on the record ... or may appear in an opinion or a memorandum of decision filed by the court.  Judgment must be entered under Rule 58.

Unlike a Rule 56 motion for summary judgment, in a Rule 52 motion the court does not determine whether there is an issue of material fact, but whether Aetna abused their discretion. *See Kearney*, 175 F.3d at 1095.  The Court is to "evaluate the persuasiveness of conflicting testimony," and make findings of fact.  *Id.*

## II.   FINDINGS OF FACT

### A.   Plaintiff's Policy, Injury, and First Payment of Benefits

Plaintiff Victoria Wong ("Wong") was a Regional Facility Manager at the Hobart West Group.  (AR 369.)  Wong obtained long-term disability ("LTD") benefits as part of a plan (the "Plan") underwritten by Defendant Aetna Life Insurance Company ("Aetna").  (AR 11.)  The Plan provides a monthly benefit for a "period of disability" caused by disease or injury, which begins the first day the member becomes disabled "as a direct result of a significant change in [the member's] physical or mental condition" while insured under the Plan.  (AR 12, 13.)  The Plan provides a two-prong definition of disability:

> From the date that you first become disabled and until Monthly Benefits are payable for 24 months, you will be deemed to be disabled on any day if:
> you are not able to perform the material duties of your own occupation solely because of:
> • disease or injury; and
> • your work earnings are 80% or less of your adjusted predisability earnings.
>
> After the first 24 months that any Monthly Benefit is payable during a period of disability, you will be deemed to be disabled on any day if you are not able to work at any reasonable occupation solely because of:
> • disease;
> • or injury.

(AR 12.)

On April 29, 2006, a little over one year after she was hired, Wong gave birth to a child. (AR 378.)  Thereafter, she began suffering from back, leg, and groin pain.  (AR 472-480.)  On

July 28, 2006, Dr. Steven Nelson, M.D., submitted an attending physician statement referencing "marked pain" and stating that Wong had no ability to work.  (AR 370-71.)  Wong consistently complained to Dr. Nelson of back, leg, and groin pain thereafter.  (*See* AR 509, 644-50, 910-16, 940-41, 1148-53, 1235-40, 1306-07.)  Aetna granted Wong LTD benefits under the Plan effective March 27, 2006.  (AR 439-441.)

## B.    Defendant's First Denial of, and Subsequent Reinstatement of Disability Benefits

Dr. Alan Kawaguchi, M.D., examined Wong and reported on the progress of her pelvic pain by letter dated July 6, 2007.  (AR 628-30.)  His assessment reflected "[p]ostpartum pelvic pain after complicated pregnancy," noting that "there are not really any good answers" and "[t]ypically these can take a long time for the symptoms to really calm down."  (AR 629.)

Aetna terminated Wong's claim in a letter dated February 1, 2008.  (AR 585-86.)  In that letter, Aetna cited three previous requests for "vocational information and medical records" that received no response, as well as unsuccessful phone calls placed in an attempt to reach Wong.  (*Id.*)  In this letter, Aetna stated, "[s]ince you have not provided us with this information, and we have no support for continued impairment, your claim for long term disability benefits is terminated effective January 31, 2008."  (AR 585.)

On March 4, 2008, Wong wrote to Aetna, stating that she and her husband had recently moved to Hawaii following her husband's deployment to Pearl Harbor, and that all of her mail had not yet been forwarded.  (*See* AR 594.)  Aetna subsequently reinstated benefits until March 27, 2008.  (*See* AR 673.)

## C.    Defendant's Second Denial of, and Subsequent Reinstatement of Disability Benefits

After 24 months of benefits, the test for disability under the Plan changes.  (AR 12.)  To determine whether Wong met the new test, Aetna reviewed her file, requested third party surveillance of her, and asked her to participate in an independent medical examination ("IME").

3

12cv2917

On May 28, 2008, Wong underwent an independent medical examination ("IME") with Dr. Leonard Cupo, M.D., board-certified in internal medicine, Medical Director of the Occupational Medical Associates of Hawaii. (*See* AR 697-712.) Dr. Cupo concluded that Wong could return to her previous job, opining that:

> Based on the objective findings of my examination the claimant can return to work as a legal analyst-regional facilities manager. Her inability to return to work as a legal analyst-regional facilities manager is based totally on subjective complaints which are disproportionate to the objective findings on physical examination and imaging studies.

(AR 711.) Dr. Cupo further concluded that Wong could work "full time full duty as a legal analyst without restrictions." (AR 728.)

In response to Dr. Cupo's IME results, Aetna terminated Wong's claim again. (*See* AR 739 ("Review of recently [performed] IME indicates that it is reasonable to assume that EE can perform her own occupation. As EE has work capacity to her own occupation, she does not pass test change and the claim is terminated.").)

In response to the termination, Wong submitted additional information in support of her claim. On July 15, 2008, Dr. Guy Paiement, M.D., an Orthopaedic Trauma/Reconstruction Surgeon at Cedars-Sinai Medical Center, examined Wong and reported the results to Aetna. (*See* AR 796-97.) Dr. Paiement noted, "[t]he palpation of symphysis pubis is extremely painful . . . . [t]he sacroiliac joints are also extremely painful." (AR 796.) Dr. Paiement completed an attending physician statement and a capabilities and limitations worksheet on July 31, 2008. (AR 818-19; 820.) Both of these documents reflected Dr. Paiement's opinion that Wong was able to work in a sedentary occupation up to eight hours per day, five days per week. (AR 819;820.) Dr. Paiement limited Wong to driving 30 minutes at a time and lifting, pushing, or pulling ten pounds for one year. (AR 819.) He also indicated that Wong could never climb, crawl, kneel, lift, pull, bend or twist, and he restricted her to only occasionally reaching above her shoulder, carrying, and reaching forward. (AR 820.)

On September 3, 2008, after Dr. Paiement reported the results of his examination to Aetna, Aetna obtained a transferable skills analysis for Wong, which is summarized in the administrative record but does not appear there in full. (*See* AR 843-44.) Aetna's notes reflect

12cv2917

that:

> while this ee ["employee"] has multiple skills, the rw ["reasonable wage"] she would need to earn without driving, lifting over 10 lbs, and the other restrictions on her ability to work will prevent her from consideration at most, if not all occupations given even many sedentary positions require some form of these activities.  At this time, it would appear, based on the tsa, that the ee would not be able to work in alternative occupations within the current capabilities, rw and skills.

(AR 844.)

On October 1, 2008, in light of Aetna's review of Dr. Paiement's report and the claim file, the insurer Aetna reversed course and notified Wong that her benefits under the plan had been extended past the date at which the plan's definition of disability changed, March 27, 2008.  (AR 866.)  Back benefits were paid from March 27, 2008 through September 30, 2008.  (AR 867.)  Shortly thereafter, on October 3, 2008, Aetna advised Wong to apply for Social Security disability benefits and referred her to Allsup, Inc. ("Allsup"), "a specialized claims administration company that provides a full range of Social Security assistance services to disability applicants."  (AR 871.)

## D. Defendant's Social Security Claim and January 2011 Termination of Disability Benefits

Just over one year later, Aetna hired ICS Merrill, an investigations company, to surveil Wong on September 24 and 25, 2009.  (AR 976-82.)  Despite entering her gated community and waiting outside her house for a total of seven hours over two days, Aetna's investigator failed to make visual contact with Wong.  (*Id.*)

On October 13, 2009, Wong visited Dr. Paiement once again.  (AR 1037.)  He noted pain, tenderness in certain areas, and difficulty with some motions.  (*See id.*)  Dr. Paiement suggested physical therapy and a follow-up visit, at which time he could determine whether a steroid injection would be appropriate.  (*See id.*)

Aetna scheduled another IME for February 12, 2010.  (AR 1098-1113.)  Aetna hired ICS Merrill to surveil Wong again around the time of her second IME.  (AR 1088-97.)  Three days of surveillance from February 11-13 yielded contact with Wong only on the 12th, the date of

her IME.  (AR 1088-89.)  On that day, the investigator made contact with Wong just after the IME took place.  (AR 1093.)  He observed Wong leaving the appointment and having lunch.  (AR 1095-96.)  He also saw Wong holding her child in her arms while seated and pushing an empty baby stroller while her husband carried the child.[1]  (*Id.*)

   Dr. Peter B. Lum, M.D., carried out the second IME.  (AR 1098.)  His report reflects pain that "is basically there every day" in "moderate amount," pain that Wong described as sharp and "rated at 10/10[,]" that "causes her to double over."  (AR 1099.)  Dr. Lum recorded that Wong "needs to sleep with pillows between her legs" and noted that she "uses a brace for back pain as the back pain is severe."  (AR 1100.)  Dr. Lum wrote that "usually the pain will come and go throughout the day" and that "[s]ometimes she is good for a couple of days," but that "sometimes when walking she has an onset of pain and needs to grab onto her husband."  (*Id.*)  Dr. Lum provided a thorough summary of the relevant medical records and then provided his findings and completed a capabilities and limitations worksheet.  (AR 1102-07; 1110-11; 1112.)  In short, Dr. Lum found that "[h]er objective diagnostic test, including plain x-rays of the pelvis, including the symphysis pubis, SI joints, and MRI scan of the low back, hip, and pelvis were all reportedly negative. Her neurological examination was normal."  (AR 1110.)  He concluded his letter as follows:

> In answer to your question as to whether Ms. Wong is able to perform her usual and customary work:
>
> According to the job description for job title: Western Regional Facilities Manager, there is no indication of physical lifting and carrying requirements. In my opinion, on an objective basis, she is able to perform those job duties. (According to Ms. Wong's description of her job to me today, she estimates the heaviest lifting and carrying would be up to 50 pounds.  She would need to drive, travel, bend, and lift and carry boxes of documents and files.  Her job required her to travel to different cities.)
>
> In answer to your question as to whether she could perform an occupation:
>
> . . . In my opinion, on an objective basis, and in consideration of her symptomatic complaints, her physical work capacity is estimated to be as follows, she would be able to perform an occupation that would allow her to alternatively sit and stand and lift and carry maximally 15 pounds, as this is the

---

[1]The parties did not lodge the video surveillance from February 12, 2010.

12cv2917

1  weight of her child, which she is able to lift and carry . . . . Her endurance may
2  be eight hours per day. Bending at the waist may be restricted to occasional
   only.

3  (AR 1111.) Dr. Lum indicated that Wong was capable of working eight hours per day and that

4  she could drive a motor vehicle. (AR 1112.) He noted that the restrictions were to be in place

5  for "6 months to 1 year." (*Id.*)

6        Allsup reported the initial denial of social security benefits on April 9, 2010. (AR 1174.)

7  It indicated it would "follow up for appeal." (*Id.*) Allsup submitted a request for

8  reconsideration to the Social Security Administration ("SSA") on April 20, 2010. (AR 1182.)

9        Aetna scheduled a "functional capacity evaluation" ("FCE") for Wong on June 9, 2010,

10 ostensibly because Dr. Lum's "IME examination was not very thorough[, at least] the report

11 [Aetna was] provided was not thorough." (AR 1198.) According to Aetna, "[i]t did not tell

12 [Aetna] what she could or could not do . . . ." (*Id.*) Aetna told Wong that if she did not attend

13 the FCE, she would be responsible for paying the cancellation fees, and it insinuated that

14 Wong's benefits could be terminated under the plan's language referencing the consequences of

15 a refusal to be examined by "an independent physician or a licensed or certified health care

16 practitioner, as requested." (AR 1202-04.)

17       Terry Lawson, PT, performed the FCE. (AR 1263-75.) The FCE contained elements

18 designed to test whether Wong was fabricating or exaggerating the extent of the pain she

19 reported. (AR 1273-75 (attempting to quantify, for instance, "whether or not the patient is out

20 for secondary gain or simply has a poor perception of pain" and "whether or not the patient is

21 exerting a good effort").) The results of the FCE indicated that "[t]here were several areas of

22 invalid and inconsistent responses in this test that have been noted" and "[t]here were other

23 issues discussed or apparent that may suggest some of the limitations may be over-reactive

24 and/or psychological versus physiological." (AR 1275.) The test form indicated that positive

25 results in such categories implied that "further psychological testing is indicated[.]" (AR 1273.)

26 It does not appear that Mr. Lawson pursued any "further" testing or based his conclusions on

27 such testing. Instead, Mr. Lawson, a physical therapist, summarized the results of the FCE by

28 opining that "the patient would appear to be safe to work at a Sedentary to Light PDC with the

12cv2917

above-noted limitations [of being able to change positions when needed, no lifting of more than 17 lbs., and no lifting of 1-3 pounds repeatedly] if she has the ability to change positions as necessary per symptoms."[2] (AR 1275.)  Mr. Lawson also adds that "[t]here were several areas of invalid and inconsistent response in this test . . ., [t]here were other issues discussed or apparent that may suggest some of the limitations may be over-reactive and/or psychological versus physiological, . . . [but] [o]n the other hand, there were some areas where she performed as expected for her complaints and diagnosis."  (AR 1275.)  Mr. Lawson's conclusion contradicts his recommendation in the summary report of the FCE, which indicates that she can only sit, stand, or walk occasionally, for "up to 2 hours of an 8-hour work day."  (*See* AR 1263.)  When Aetna reviewed the results of the FCE, it concluded, in part, that Wong's "pain questionnaires were completed and the results *did not suggest symptom magnification*."  (AR 1291 (emphasis added).)

On an attending physician statement dated June 15, 2010, Wong's treating physician, Dr. Nelson, again indicated that Wong had no ability to work.  (AR 1251.)  The worksheet that Dr. Nelson filled out for his physician statement prompted him to indicate how many hours and how many days a week he believed Wong could work.  (AR 1251.)  There was no place to indicate zero hours or zero days, so he wrote it in.  (AR 1251.)  He referenced his original recommendation from 2006, and he noted continuing back and pelvic pain.  (AR 1251.)

Two weeks later, on June 30, 2010, Aetna sent Dr. Nelson a letter prompting him to agree with Mr. Lawson's medical opinions and conclusions summarized from the FCE, going so far as to include a signature line for Dr. Nelson directly below the following two sentences:

> Based on this data, I would conclude that the functional capacity evaluation results represent her minimal level of function at this time and would expect improvement as her level of conditioning improves with physical therapy and Pilates.

> While I understand that her symptoms may impact her capacity to some degree, it is my opinion that the establishment of a routine, emotional support of a work environment and the social contact would benefit her overall constitution and serve to increase her functional capacity and quality of life.

---

[2]Note that a physical therapist license "does not authorize the diagnosis of disease." *See* Cal. Bus. & Prof. Code § 2620(a).

(AR 1295.)  The letter also explicitly stated that Aetna understood that their "records appear to demonstrate a lack of consensus regarding [Wong's] functional levels."  (AR 1294.)  Dr. Nelson did not respond. (*See* AR 1402.)

Aetna sent Dr. Nelson another letter on July 21, 2010.  (AR 1314.)  This letter stated that Wong's complaints of pelvic pain "do not appear to have impacted her activities of daily living and she has continued to care for her children[,]" an assessment for which it provided no factual basis.  (*Id.*)  The letter further prompted Dr. Nelson for "any comments [on the FCE he] may wish to provide within 10 business days."  (*Id.*)

On September 1, 2010, Allsup updated Aetna with the denial of Wong's request for reconsideration of the original denial of her social security benefits. (AR 1330.)  Allsup appealed, and the hearing date was set for October 21, 2010.  (AR 1339.)

On November 11, 2010, the Aetna representative handling Wong's claim noted that she had discussed the claim with a clinical consultant named Mark Williams, "as apparently Dr. Nelson is not going to reply to our request for him to review the FCE performed and the FCE appears to indicate she has light functional capacity from his review of the test results."  (AR 1340.)  On November 21, the same Aetna representative noted that "it appears [Wong] can do more than the previous [transferable skills analysis had indicated] based on the 6/9/2010 FCE." (AR 1341.)

Aetna hired Coventry Health Care to provide a labor market analysis ("LMA") using the results of Mr. Lawson's FCE.  (AR 1381-85.)  The result of the LMA was that several occupations around Wong's residence in Stockton, California "[were] consistent with the residual functional capacity of Ms. Wong."  (AR 1384.)

Given the results of the Lawson's FCE and the LMA, Aetna terminate Wong's benefits effective December 31, 2010.  (AR 1387-88.)  In a letter dated January 3, 2011, Aetna informed Wong of the decision and explained the rationale behind it.  (AR 1399-1404.)  Aetna noted Dr. Lum's February 2010 conclusion that "he felt [Wong was] able to perform an occupation that would allow [her] to alternate sitting and standing and lifting and/or carrying up to a maximum

12cv2917

1  of 15 lbs, as that was the weight of [her] child." (AR 1401.)  The letter referenced Dr. Nelson's

2  June 15, 2010 attending physician statement but erroneously stated that "[h]e did not document

3  [Wong's] functional capacity. . . ." (AR 1401-02; *see* AR 1251 (documenting Dr. Nelson's

4  notations that Wong had no ability to work).)  The core of Aetna's rationale for terminating

5  Wong's benefits seems to have been Mr. Lawson's June 2010 FCE, including Mr. Lawson's

6  findings regarding "the Waddell's Testing[,]" "[t]he Validity Profile[,]" and "inappropriate

7  illness behavior[.]" (AR 1402.)  The letter further stated, "[t]he physician also noted [Wong]

8  had very limited changes in [her] vital signs post examination despite [her] reported pain level

9  rating of 8." (AR 1395.)  In light of the fact that a physical therapist performed the FCE, it is

10  not clear to which physician the termination letter referred. (*See* AR 1263-75.)

11       The termination letter further stated that the FCE "was reviewed by our clinician . . . ."

12  who "concluded that [Wong] demonstrated functional capacity to perform a full time sedentary

13  to light capacity occupation with lifting up to 17 lbs., and [she] may need to alternate posture

14  changes." (AR 1395.)  The letter did not identify the clinician, and this unnamed clinician's

15  qualifications do not appear in the administrative record. (*Id.*)  The letter stated that Aetna

16  provided the results of the FCE to Dr. Nelson, and that Dr. Nelson did not respond. (*Id.*)

17  Aetna's termination letter further referenced review of the FCE by an unidentified "vocational

18  consultant," and the subsequent LMA that indicated that there were occupations near Stockton

19  that would have yielded Wong a reasonable wage of $32.22/hour. (*Id.*)  The letter concludes:

20        While we understand you still have reported symptoms of back and pelvic pain, your

21  condition was noted to have improved with physical therapy and Pilates. The medical documentation received and reviewed by Aetna doe[s] not support you have a level

22  of impairment which would preclude you from performing a sedentary to light functional capacity occupation. The medical information we received by two

23  independent physicians supports you have the functional capacity to perform other sedentary to light occupations. We have determined that there are other sedentary to

24  light occupations in your geographical location which would provide a reasonable wage. Therefore, we have determined that you no longer meet the definition of

25  disability as defined by the policy and your benefit eligibility has been terminated effective December 31, 2010.

26  (AR 1403.)  Aetna never explicitly identifies who the "two independent physicians" are.

27       Dr. Nelson responded to Aetna's communications by letter dated February 24, 2011.

28  (AR 1397-98.)  He stated that he had received Aetna's communications, but was "somewhat

12cv2917

confused as to how to respond . . . ." (AR 1397.)  He wrote:

> I wish I had the time or the opportunity to spend the number of hours you have spent trying to negate this claim and the twenty pages of documents you have prepared for me to read in my leisure.
>
> I have known Victoria [Wong] since she was a young girl. She has not impressed me at any time of being a malingerer or a disability seeker as your letters seem to imply. I do not disagree with any of your evaluations and I think those can all be done by her at any one particular point in time. I do not think that these are going to work out well for her on a forty hour work week where it incurs these kinds of activities and exercises on a daily basis.

(*Id.*)  Dr. Nelson did not explain to which evaluations he referred, or what he believed Wong could do "at any one particular point in time."  (*Id.*)  Dr. Nelson concluded his letter by indicating that he expected Ms. Wong's health issues to continue and that there was no "clean-cut resolution at the present time and I expect that they will continue."  (AR 1397-98.)

### E.   Wong's Appeal of the January 2011 Termination of Benefits

Wong appealed the benefits termination on March 12, 2011; she resubmitted it on May 24, 2011 after being notified that Aetna had not initially received her letter.  (AR 1472.)  On August 12, 2014, Dr. Kenneth Kopacz, M.D., board-certified in orthopedic surgery, reviewed Wong's file.  (AR 1514-17.)  Dr. Kopacz noted that Wong "has been seen ambulating while pushing an item and has been evaluated by a FCE[,] showing ability to work nearly at a full time light level position."  (AR 1516.)  He further opined that Wong "has been shown to be active and [sic] the surveillance video and has been shown to have a FCE indicating nearly light duty work."  (AR 1517.)  Dr. Kopacz wrote that he "[disagreed] with the provider recommendation of no work activity."  (*Id.*)  He concluded that "[Wong's] medical examinations have not shown any objective findings that would support the inability to perform a sedentary position[,]" that "[t]here is no clinical reason that [Wong] cannot work in a full time sedentary position based upon the clinical data that was provided[,]" that Wong "would be able to work in a sedentary position, full time from 1/1/11 to the present[,]" and that Wong "should be able to lift over 10 pounds, walk, stand and sit with the ability to change position briefly every two hours."  (*Id.*)  He further concluded that Wong should be able to perform the work

1   activities outlined in the LMA.  (*Id.*)

2        Dr. Kopacz issued a further review on August 30, 2011.  (AR 1518-21.)  In this second

3   review, he referenced a "peer-to-peer consultation," or a phone conversation he ostensibly had

4   with Dr. Nelson on August 30, 2011.  (AR 1520.)  In the review he asserted that Dr. Nelson told

5   him over the phone that "[Dr. Nelson] felt that the claimant could work at a sedentary position

6   as long as she had some accommodations to be able to change positions every few hours."  (AR

7   1520.)  The conclusions of Dr. Kopacz's second review are virtually identical to those of his

8   first.  (AR 1514-17; 1518-21.)

9        On September 22, 2011, Aetna sent a letter to Wong denying her May 2011 appeal of her

10  benefits termination.  (AR 1527-30.)  The denial of Wong's appeal concluded that:

11       based on the information provided, there is a lack of medical evidence (i.e. abnormal
         diagnostic testing, office notes documenting abnormal physical exam findings, etc.)
12       supporting a functional impairment that would have prevented you from performing
         work of any reasonable occupation as of 01/01/11.  Therefore, the original decision
13       to terminate LTD benefits effective 01/01/11, has been upheld . . . . This decision is
         final and not subject to further review.
14
    (AR 1529.)
15
16       On October 21, 2011, the SSA issued its Social Security disability benefits decision.

17  (*See* Doc. 46, Ex. 1[3]; AR 1531.)  The SSA found that Wong became disabled on October 6,

18  2009.  (AR 1540.)  It granted a Social Security Disability Income Benefit effective April 1,

19  2010.  (AR 1536; 1540.)  Allsup notified Aetna of the SSA award on October 28, 2012.  (*See*

20  AR 1531.)

21       Aetna sent a letter to Wong on November 18, 2011 asserting that, because the terms of

22  the plan require that Aetna "decrease [Wong's] monthly benefit by the amount of [her] Social

23  _____

24       [3]The Court's review of Aetna's benefits decision is limited to the record before the plan
    administrator. *See Jebian v. Hewlett-Packard Co. Employee Benefits Org. Income Prot. Plan*,
25  349 F.3d 1098, 1110 (9th Cir. 2003). Because the record before Aetna did not include the
    contents of the SSA decision, the Court grants judicial notice of the SSA decision only for the
26  purposes of assessing the effect of Aetna's conflict of interest, *Montour v. Hartford Life & Acc.
    Ins. Co.*, 588 F.3d 623, 637 (9th Cir. 2009), and for adjudicating Aetna's counterclaim for
27  overpayment. (Doc. 46, Ex. 1.) Nonetheless, the fact of the SSA award appears in the
    administrative record, and the court will review the merits of Aetna's benefits decision in light
28  of that fact. (*See* AR 1531.)

12cv2917

Security benefit," it was entitled to reimbursement for the retroactive benefits granted by the SSA in the amount of $12,402, or $1,378/month for the nine months in 2010 that Aetna had already paid Wong benefits under her plan.  (AR 1536-39;1540; *see also* AR 12, 14, and 16 (detailing the calculation of benefits under the plan).)  Aetna was evidently unable to recover the amount of Wong's Social Security benefits it asserted it was owed, as Wong was "not being cooperative."  (AR 1569.)  Aetna thereafter referred its claim to a collections agency.  (AR 1572.)

### F.    The Current Litigation

Wong brought this action on December 7, 2012, stating claims for: (1) declaratory relief for LTD benefits; and (2) declaratory relief for remand for a full and fair review.  (*Compl.*, Doc. 1.)

On February 5, 2013, Aetna filed an answer to the complaint and a counterclaim for the retroactive social security award Wong received, prorated for the months Aetna had already awarded benefits to Wong.  (Doc. 9.)  Wong answered the counterclaim on February 22, 2013.  (Doc. 15.)

On July 3, 2013, both parties stipulated to lodging the administrative record and to an abuse of discretion standard governing this Court's review of Aetna's decision terminating Wong's benefits.  (Doc. 22.)  The Court granted both parties' joint motion as to this stipulation on July 3, 2013.  (Doc. 24.)

On December 2, 2013, both parties jointly moved to file cross-trial briefs instead of cross-motions for summary judgment.  (Doc. 41.)  The Court granted this joint motion on December 4, 2013.  (Doc. 42.)  Wong and Aetna both filed their opening trial briefs on January 3, 2014.  (Docs. 45; 47.)  Wong requested judicial notice of the October 21, 2011 SSA decision granting her social security benefits.  (Doc. 46.)  Aetna opposed judicial notice. See *supra* note 3.  On January 27, 2014, both parties submitted responsive trial briefs.  (Docs. 50; 52.)  Wong attached a declaration to her responsive trial brief.  (Doc. 51.)  Defendant filed objections to this

12cv2917

1   declaration.[4]  (Doc. 56.)

2

3   **III.   LEGAL STANDARD**

4        A claim of denial of benefits in an ERISA case "is to be reviewed under a de novo

5   standard unless the benefit plan gives the administrator or fiduciary discretionary authority to

6   determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber*

7   *Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d

8   623, 629 (9th Cir. 2009).  If, however, the "benefit plan gives the administrator or fiduciary

9   discretionary authority to determine eligibility for benefits or to construe the terms of the plan,"

10  the decision to deny benefits and the interpretation of the plan are reviewed for abuse of

11  discretion.  *Firestone*, 489 U.S. at 115.  In the present case, the parties have stipulated to an

12  abuse of discretion review.  (*See July 3, 2013 Order* [Doc. 24].)

13       Under the "deferential" abuse-of-discretion standard, "a plan administrator's decision

14  will not be disturbed if reasonable.  This reasonableness standard requires deference to the

15  administrator's benefits decision unless it is (1) illogical, (2) implausible, or (3) without support

16  in inferences that may be drawn from the facts in the record." *Stephan v. Unum Life Ins. Co. of*

17  *Am.*, 697 F.3d 917, 929 (9th Cir.2012) (internal quotation marks and citations omitted).

18       In *Firestone*, the Supreme Court recognized that there are situations where a plan

19  administrator or fiduciary that has discretion under the plan is operating under a conflict of

20  interest.  489 U.S. at 115.  When an insurer acts as both the plan fiduciary and the funding

21  source for benefits, an inherent structural conflict of interest exists.  *Abatie v. Alta Health &*

22  *Life Ins. Co.*, 458 F.3d 955, 965 (9th Cir. 2006) (citing *Tremain v. Bell Indus., Inc.*, 196 F.3d

23  970, 976 (9th Cir.1999)).  The presence of a conflict of interest merely contributes to the district

24  court's decision of "how much or how little to credit the plan administrator's reason for denying

25  insurance coverage."  *Id.* at 968.  If a structural conflict is unaccompanied by evidence of

26  "malice, of self-dealing, or of a parsimonious claims-granting history," its effect on the district

27

28       _____
         [4]  The Court does not base its ruling on anything from Wong's declaration.

1  court's analysis may be slight. *Id.* If, however, "the administrator provides inconsistent reasons

2  for denial, fails adequately to investigate a claim or ask the plaintiff for necessary evidence,

3  fails to credit a claimant's reliable evidence, or has repeatedly denied benefits to deserving

4  participants by interpreting plan terms incorrectly or by making decisions against the weight of

5  evidence in the record," the district court may weigh the presence of a conflict more heavily. *Id.*

6  at 968–69 (internal citations omitted).

7       Even if the plan presents these more serious conflicts, the standard of review remains

8  abuse of discretion. *Id.* 968–69. "[T]he existence of a conflict [is] a factor to be weighed,

9  adjusting the weight given that factor based on the degree to which the conflict appears

10  improperly to have influenced a plan administrator's decision." *Montour v. Hartford Life &*

11  *Acc. Ins. Co.*, 588 F.3d 623, 631 (9th Cir.2009). Additional factors to be considered in

12  determining whether a plan administrator or fiduciary abused its discretion include "the quality

13  and quantity of the medical evidence, whether the plan administrator subjected the claimant to

14  an in-person medical evaluation or relied instead on a paper review of the claimant's existing

15  medical records, whether the administrator provided its independent experts with all of the

16  relevant evidence, and whether the administrator considered a contrary SSA disability

17  determination, if any." *Id.* (internal quotation marks omitted).

18       "An administrator must provide a plan participant with adequate notice of the reasons for

19  denial, 29 U.S.C. § 1133(1), and must provide a 'full and fair review' of the participant's claim,

20  *id.* § 1133(2); *see also* 29 C.F.R. § 2560.503–1(g)(1), (h)(2)." *Abatie*, 458 F.3d at 974. If an

21  administrator fails to provide either notice or a full and fair review, the Court must take the

22  resulting procedural violations of ERISA into account in deciding whether Aetna abused its

23  discretion. *See id.*

24  //

25  //

26  //

27  //

28  //

12cv2917

## IV.    CONCLUSIONS OF LAW

### A.    Aetna abused its discretion in terminating Wong's benefits.

Aetna's reasoning, both in its January 2011 termination letter and in its September 2011 final appeal denial letter, suffers from numerous defects that render its decision to terminate Wong's benefits unreasonable.  (*See* AR 1399-1404.)

### 1.    Aetna's reliance on the FCE in its January 2011 termination of benefits decision was unreasonable.

The focal point[5] of the January 3, 2011 denial letter was the June 9, 2010 FCE conducted by Mr. Terry Lawson, PT.  (*See* AR 1399 (introducing the letter by reference to the FCE); AR 1402 (explaining at length that the FCE formed the basis for later occupational analyses that supported the conclusion that Wong could work).)  This is problematic on a number of levels.

As an initial matter, Mr. Lawson was a physical therapist, not a physician, though the denial letter erroneously referred to him as such.  (*See* AR 1402 ("The physician also noted you had very limited changes in your vital signs immediately post examination despite your reported pain level rating of 8.") (apparently referring to Mr. Lawson's note on page 1274 of the administrative record, in which Lawson references "[v]ery limited changes in overall vitals immediately post-FCE despite 8 pain rating").)

Aetna's benefits denial letter focused heavily on results of portions of the FCE that, though not explained in plain English, seem to purport measurement of whether Wong was fabricating or exaggerating the extent of her pain for personal pecuniary gain:

The FCE results documented you have sedentary to light functional capacity with

---

[5] Though the denial letter mentioned Dr. Lum's conclusion that Wong was able to work, conspicuously absent is Dr. Lum's statement in the same report that Wong reported pain "rated at 10/10[,]" that "causes her to double over[,]" or any explanation as to how these two reported facts might be reconciled.  (*See* AR 1111; AR 1098.)  In addition, the denial fails to explain why Dr. Lum and Aetna appear to have completely discounted the fact that Wong's description of her job was completely different than the job for which Dr. Lum was giving his opinion.  (*See* AR 1111.)  Further, relying on Lum's report was unreasonable given the fact Aetna characterized Lum's report as "not thorough" and ordered extra testing after examining the report.  (AR 1198.)

> restrictions of occasional standing and walking, no kneeling, and occasional twisting and forward bending. The evaluation further noted there was symptom magnification on the Waddell's Testing. The Validity Profile was noted in four out of four categories. It was also noted that you exhibited inappropriate illness behavior in four out of seven categories tested. The physician also noted you had very limited changes in your vital signs immediately post examination despite your pain level rating of 8.

(AR 1402.) Thus, it appears that Aetna is suggesting that it is their opinion from review of the FCE that Wong is claiming that her pain is worse than it actually is. However, when Aetna first reviewed the FCE, Aetna concluded that Wong's "pain questionnaires were completed and the results *did not suggest symptom magnification*." (AR 1291 (emphasis added).) Thus, Aetna's positions are contradictory. It was unreasonable for Aetna to rely so heavily upon the FCE as evidence of symptom magnification when their own records indicate otherwise.

In addition, two of the above-referenced categories appearing on the FCE form explicitly stated that positive responses in those categories meant that "further psychological testing is indicated to determine whether or not the patient is out for secondary gain or simply has a poor perception of pain as it relates to function [or dysfunction]." (AR 1272 ("Waddell's Testing"); AR 1273 ("Inappropriate Illness Behavior Profile").) Yet the administrative record provides no indication that Aetna ever prompted Wong for further psychological testing. On the contrary, it would seem that the claims administrator simply used Mr. Lawson's conclusions in the FCE as medical diagnoses of "symptom magnification" and "inappropriate illness behavior."[6] (*See* AR 1402.) Further, Aetna fails to reconcile Lawson's contradictory opinions that "patent would appear safe to work" (AR 1275) but she can on sit, stand, or walk occasionally, for "up to 2 hours of an 8-hour work day.")

Instead of testing Wong in accordance with the FCE's instructions in order to medically determine whether her pain was real, or even plainly stating in its denial letter a belief that the FCE results implied it was not, Aetna chose to provide cryptic jargon not calculated for Wong's understanding. *See* 29 U.S.C. § 1133. Moreover, the language quoted above is not meaningful to a lay claimant seeking to understand and substantively respond to the rationale of a benefits

---

[6]A California physical therapist license "does not authorize the diagnosis of disease." *See* Cal. Bus. & Prof. Code § 2620(a).

12cv2917

denial decision so as to receive a full and fair review.  *See* 29 U.S.C. § 1133 ("every employee benefit plan shall . . . provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, *written in a manner calculated to be understood by the participant*[.]" (emphasis added));  *see Abatie*, 458 F.3d at 974.

In light of the foregoing, the Court finds Aetna abused its discretion by unreasonably relying on the FCE to deny Wong's benefits.

> **2.    Aetna unreasonably grounded its  January 2011 termination of benefits decision on an anonymous and potentially unqualified clinician's corroboration of the physical therapist's conclusions.**

Aetna's January 2011 termination letter continues with a statement that:

> The Functional Capacity Evaluation was reviewed by our clinician. Our clinician's review concluded that you demonstrated the functional capacity to perform a full time sedentary to light capacity occupation with lifting up to 17 lbs., and you may need to alternate posture changes.

(AR 1402.)  The letter does not identify the clinician or his employer, it does not identify the clinician's qualifications, and it is devoid of any of his or her reasoning.  The letter fails to provide notice of any impact of his or her opinion on Aetna's denial, thereby denying Wong meaningful opportunity to refute that opinion.  *See Abatie*, 458 F.3d at 974.  The administrative record identifies a "clinical consultant" by the name of Mark Williams, who is apparently under the employ of Aetna itself.  (*See* AR 1340.)  There is no indication in the record that Mr. Williams is a physician, or that he has any other relevant qualification for medically or psychologically assessing the source or extent of Wong's pain.

Therefore, it was unreasonable for Aetna to partially base Wong's termination on this incomprehensive review of the FCE.

> **3.    Aetna's  January 2011 termination of benefits decision improperly misconstrued the behavior of Wong's treating physician.**

12cv2917

The termination letter incorrectly states that Dr. Nelson did not document Wong's functional capacity. (AR 1401-02.) Although Dr. Nelson does not appear to use the words "functional capacity," he clearly indicated that Wong had no capacity to work, not even for one hour. (*See* AR 1251 (documenting Dr. Nelson's notations that Wong had no ability to work).)

The letter subsequently cites Dr. Nelson's failure to respond to Aetna's attempts to contact him on June 30 and July 21, 2011 as though his silence were a tacit concession of the FCE's medical conclusions. (*See* AR 1295 (a letter to Dr. Nelson including a signature line below a statement to confirm the FCE's conclusions that contradicted Dr. Nelson's assessment two weeks prior); AR 1314 (prompting Dr. Nelson to respond to the assertion that Wong's complaints of pelvic pain "do not appear to have impacted her activities of daily living . . ."); AR 1402.)

It was incorrect for Aetna to assert that Dr. Nelson did no document her functional capacity. More importantly, it was unreasonable to treat Wong's treating physician's silence as acceptance, especially in light of Aetna's approach. Namely, Aetna simply asked Dr. Nelson to review a report of an FCE he did not conduct on his own time. The Court is left with the distinct impression that this approach was calculated to encourage no reply, or an affirmative reply. The letter outlines a time consuming procedure for Dr. Nelson to perform if he does not agree with Aetna's aversion of events:

> If you do not agree with this conclusion, please provide your clinical rationale with test results and any other evidence you feel would help us to understand what would prevent this level of function. Would there be any accommodations an employer could provide that would allow Ms. Wong to return to work? If so, please elaborate. Are there any other tests that you feel would be helpful in assessing Ms. Wong's current functional status?

(AR 1295.) Aetna is essentially asking Dr. Nelson to do a complete review of their work and conduct tests of his own. It was unreasonable of Aetna to believe, to the extent that it did, that Dr. Nelson would respond to such a request. Therefore, it was unreasonable to rely on his lack of an answer as evidence that Wong was not disabled, to any extent that it did.

//

//

19

12cv2917

1

2    **4.    On appeal, Aetna improperly denied Wong access to her physician's**

3    **unexplained change of prognosis, obtained over the phone**

4    **immediately before the denial and reported to her only through the**

     **final denial and only secondhand through a reviewing doctor.**

5        Dr. Nelson later responded to the FCE in time for the administrative appeal by stating his

6    opinion that, "I do not think that these are going to work out well for her on a forty hour work

7    week where it incurs these kinds of activities and exercises on a daily basis." (AR 1397.) Yet

8    curiously, the appeal denial letter does not analyze or even mention this opinion, or Dr.

9    Nelson's preceding June 15, 2010 assessment that Wong was totally unable to work. (AR 1585;

10   *see* AR 1251; AR 1397.) Instead, the appeal denial letter references a contact with Dr. Nelson

11   that does not appear in the administrative record. (AR 1585.) In the letter, Aetna asserts that:

12       . . . the independent physician reviewer conducted a peer to peer conference call with
         Dr. Nelson on 08/30/11. Dr. Nelson opined that you were capable of performing work
13       in a sedentary position, as long as you were capable of performing work in a sedentary
         position, as long as you were able to change positions every few hours.

14

15   (*Id.*)  This statement is inconsistent with all other assessments Dr. Nelson made.  (*See, e.g.* AR

16   371 (opining that Wong had no ability to work on August 1, 2006); AR 1150 (opining that

17   Wong had no ability to work as of March 15, 2010); AR 1251 (opining that Wong had no

18   ability to work as of June 15, 2010); AR 1397 (opining on February 24, 2011 that Wong did not

19   impress him as a "disability seeker," that as of his last contact with her she continued to have

20   pain on a daily basis that had "remained the same," and that she would have trouble with

21   unspecified activities similar to those of the FCE on a full-time basis).)  Moreover, as explained

22   above, Dr. Nelson's response was marred by the procedure that Aetna asked him to follow.

23   Therefore, Aetna's conclusion that Dr. Nelson "opined" that Wong could perform work in a

24   sedentary position was unreasonable.

         Further,

25
     When an administrator tacks on a new reason for denying benefits in a final decision,
26   thereby precluding the plan participant from responding to that rationale for denial at
     the administrative level, the administrator violates ERISA's procedures. [citation
27   omitted] "[S]ection 1133 requires an administrator to provide review of the specific
     ground for an adverse benefits decision." Robinson, 443 F.3d at 393. By requiring that
28   an administrator notify a claimant of the reasons for the administrator's decisions, the

12cv2917

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> statute suggests that the specific reasons provided must be reviewed at the administrative level. Id. Moreover, a review of the reasons provided by the administrator allows for a full and fair review of the denial decision, also required under ERISA. *Id.*

*Abatie*, 458 F.3d at 974.  Because Dr. Nelson's purported change of prognosis took place just in time for the final, unreviewable administrative appeal, Wong had no opportunity to meaningfully respond to it.  *See id.*  So far as the record indicates, the last time Dr. Nelson examined Wong was more than one year prior, and in that examination he indicated that Wong was totally unable to work.  (*See* AR 1251.)  Dr. Nelson stated that Wong's pain remained unchanged via a February 24, 2011 letter to Aetna.  (AR 1397.)  The record provides no hint as to what might have caused Dr. Nelson to change his prognosis for Wong without subsequent examination.  This procedural impropriety again demonstrates that Aetna abused its discretion. *See Abatie*, 458 F.3d at 974.

### 5.    On appeal, Aetna improperly used evidence that four years prior Wong could walk and had good x-ray results as new reasons for denial, of which it had given Wong no previous notice.

The letter indicating denial of Wong's appeal further states that "[o]n 07/06/07, you had complaints in the pelvis, but you were able to walk up to 20 minutes but not carry any heavy objects. Radiographs showed a normal pelvis with closed pubic symphysis." (AR 1585.)  The denial letter does not specify the setting at which this twenty minutes of walking took place, or at which the objective findings appeared.  (*Id.*)  Yet this would seem to be a reference to Dr. Kawaguchi's examination, which concluded that "this was a difficult problem and there [were] not really any good answers," that "[t]ypically these can take a long time for the symptoms to really calm down." (AR 628-30.)  Dr. Kawaguchi's examination conclusions do not appear to contain any reference to walking for twenty minutes.  Even if they did, it is not abundantly clear how twenty minutes of walking four years prior relates to whether a person can work a full eight-hour day in the present.  Moreover, no reference to a 2007 examination in which Wong purportedly displayed an ability to walk for twenty minutes appears in Aetna's January 2011

12cv2917

termination letter. (AR 1399-1404.)  Aetna tacked this new reason for denial onto the final and unreviewable appeal decision, "a maneuver that has the effect of insulating the rationale from review, [contravening] the purpose of ERISA[.]" *See Abatie*, 458 F.3d at 974.  This is more evidence that Aetna abused its discretion.

> **6.    On appeal, Aetna improperly used the opinion of an orthopedic surgeon who chiefly based his opinion on surveillance video of Wong, of which she had never been made aware.**

The appeal denial letter also asserts that Wong's claim file "was reviewed by "[an] independent physician reviewer specializing in [o]rthopedic [s]urgery."  (AR 1585.)  The letter does not identify the independent physician reviewer or his qualifications, but it would seem that this is a reference to the August 12, and August 30, 2014 reviews of Wong's file by Dr. Kenneth Kopacz, M.D., board-certified in orthopedic surgery.  (AR 1514-17; AR 1518-21.)  As noted above, in forming his conclusions Dr. Kopacz relied heavily upon the surveillance video that, so far as the record indicates, had never been disclosed to Wong.  (*See* AR 1516 (noting that Wong "has been seen ambulating while pushing an item and has been evaluated by a FCE[,] showing ability to work nearly at a full time light level position"); AR 1517 (stating that Wong "has been shown to be active and [sic] the surveillance video").)  The fact that Aetna never informed Wong of the existence of this surveillance video entirely deprived her of the ability to respond to Dr. Kopacz's opinion, let alone in a meaningful way.  This is a glaring procedural omission that contravenes the purpose of ERISA, *Abatie*, 458 F.3d at 974, and it presents a compelling suggestion that Aetna's conflict of interest played a significant role in the administrative appeal process.

//

//

//

//

//

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**7.     On appeal, Aetna improperly shifted the reason for its denial away from a suggestion that Wong was fabricating her pain and toward a requirement for objective evidence that overlooked her symptomatic complaints as reported by her treating physician.**

Wong's appeal denial letter concludes:

> Therefore, based on the information provided, there is a lack of medical evidence (i.e. abnormal diagnostic testing, office notes documenting abnormal physical exam findings, etc.) supporting a functional impairment that would have prevented you from performing work of any reasonable occupation as of 01/01/11. Therefore, the original decision to terminate LTD benefits effective 01/01/11 has been upheld . . . . This decision is final and not subject to further review.

(AR 1585.)  First, Aetna's conclusion that there is a lack of medical evidence to support Wong's claim fails to acknowledge or take into account the June 15, 2010 assessment by Dr. Nelson, Wong's treating physician, that Wong was totally unable to work.  (*Id.*; *see* AR 1251.)  It also fails to take into account Dr. Nelson's February 24, 2011 opinion that Wong's pain had not changed.  (*Id.*; *see* AR 1397.)

Critically, the inclusion of the parenthetical in the above-quoted language shifted the meaning of the phrase "medical evidence" away from subjective complaints of pain[7], essentially constituting a new requirement of objective measurement that does not appear in the plan.  (*Id.*; *see* AR 12-13 (relevant plan language).)  Whereas the January 2011 termination letter's FCE jargon insinuated that Wong was fabricating or exaggerating the extent of her pain, the appeal decision ignored Dr. Nelson's opinion that the pain was unchanged and focused on the lack of physical findings to support her claim.  *See Salomaa*, 642 F.3d at 679 ("The continual shifting of the plan's grounds for denial also suggest[s] abuse of discretion.")

In light of the procedural and substantive improprieties, unreasonableness, omissions, and irregularities which pervade the January 2011 termination and appellate administrative denial of Wong's benefits, this Court concludes that Aetna abused its discretion in terminating Wong's benefits.

---

[7]As noted above, Wong had consistently complained to Dr. Nelson of pain since 2006. (*See* AR 509, 644-50, 910-16, 940-41, 1148-53, 1235-40, 1306-07.)

12cv2917

**B.    Aetna may not retroactively attach Wong's Social Security disability benefits.**

In its counterclaim, Aetna seeks Wong's retroactively awarded Social Security benefits. (*See* Doc. 9.)  It divides its counterclaim into three causes of action, one for violation of ERISA[8], one for equitable restitution, and one for declaratory relief.  (Doc. 9, p. 19-20.)  For the reasons that follow, these three causes of action all rest in equity, and they are all subject to the same standard.

ERISA authorizes a civil action:

> by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (I) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan;

29 U.S.C.A. § 1132(a)(3) ("Persons who may bring a civil action").  This section precludes actions at law. *See Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 218 (2002).  Thus, to the extent that ERISA authorizes Aetna's counterclaim against Wong, Aetna's counterclaim must rest in equity.

There are "at least three criteria for securing an equitable lien by agreement in an ERISA action[:]"

> First, there must be a promise by the beneficiary to reimburse the fiduciary for benefits paid under the plan in the event of a recovery from a third party. Second, the reimbursement agreement must "specifically identif[y] a particular fund, distinct from the [beneficiary's] general assets," from which the fiduciary will be reimbursed. Third, the funds specifically identified by the fiduciary must be "within the possession and control of the [beneficiary]."

*Bilyeu v. Morgan Stanley Long Term Disability Plan*, 683 F.3d 1083, 1092-93 (9th Cir. 2012), cert. denied, 133 S. Ct. 1242 (2013) (internal citations omitted) (quoting *Sereboff v. Mid Atl. Med. Servs., Inc.*, 547 U.S. 356, 363 (2006)).

Here, as in *Bilyeu*, "the first criterion is clearly satisfied."  *See* 683 F.3d at 1093.  Wong does not dispute that she contracted to reimburse Aetna for overpayment of LTD benefits

---

[8]Aetna does not specify which section of the United States Code entitles it to the form of relief it seeks. (*See* Doc. 9, p. 19-20.)

1  stemming from her receiving benefits from other sources, including the SSA.

2        Aetna attempts to identify the particular fund as the plan benefits overpaid to Wong. (*See*

3  Doc. 9, p. 20:11-14.)  However, as the Ninth Circuit noted in *Bilyeu*, the Social Security Act

4  prohibits attachment of Social Security disability benefits.  *See* 683 F.3d at 1093-94. *See* 42

5  U.S.C. § 407 ("[N]one of the moneys paid or payable or rights existing under this [Social

6  Security] subchapter shall be subject to execution, levy, attachment, garnishment, or other legal

7  process.").  "Under the Social Security Act, [the claimant] could not assign her social security

8  benefits, and [the claims administrator] could not attach them."  *Bilyeu*, 683 F.3d at 1093 (9th

9  Cir. 2012) cert. denied, 133 S. Ct. 1242 (U.S. 2013).  As such, and because the fact that Wong's

10 plan benefits have already been paid out precludes identifying the benefits themselves as a

11 particular fund, the Plan does not identify a fund distinct from Wong's general assets that would

12 permit attachment of her Social Security disability payments.  *See id.*

13       Third and finally, as in *Bilyeu*, "[the claimant] asserts, and [the claims administrator] has

14 not refuted, that [the claimant] has spent the overpaid benefits."  (Doc. 45, p. 25:10-12 ("Wong

15 spent the previously paid Aetna money long ago.").)

16       In short, because Aetna has not met the criteria the Ninth Circuit has established for

17 securing an equitable lien by agreement in an ERISA action, Aetna's counterclaim must be and

18 is dismissed.

19

20 **V.    CONCLUSION AND ORDER**

21       Having thoroughly reviewed the entire administrative record and based on the foregoing,

22 the Court finds that Aetna's decision to terminate Wong's disability payments, effective

23 December 31, 2010, and Aetna's decision to deny Wong's appeal of that decision, were both

24 unreasonable and amount to an abuses of discretion.  As a result of this, the Court **ORDERS**

25 **AS FOLLOWS:**

26 //

27 //

28 //

1.  Wong's Rule 52 motion for judgment is **GRANTED IN PART AND DENIED IN PART.**

2.  Wong's motion is **GRANTED** with respect to her claim that Aetna abused its discretion.  Aetna is directed to reinstate Wong's disability payments retroactive to its January 2011 denial (which became effective December 31, 2010).

3.  Wong's motion is **GRANTED** with respect to her claim that Aetna cannot attach her retroactively granted Social Security benefits.

4.   Wong's motion is **DENIED WITHOUT PREJUDICE** to the extent it requests attorney's fees.  Plaintiff may also be entitled to an award of reasonable attorney's fees and costs which should be made by motion. See 29 U.S.C. § 1132(g).  Plaintiff shall contact chambers to obtain a hearing date for a separate motion for attorney's fees and costs within 20 days of the filing of this Order.

5.  Aetna's Rule 52 motion for judgment is **DENIED.**

6.  Aetna's counterclaims are **DENIED**.

7.  The parties' joint motion for hearing on the trial briefs is **DENIED AS MOOT**. (Doc. 54.)

**IT IS SO ORDERED.**

DATED: September 25, 2014




_____
M. James Lorenz
United States District Court Judge

12cv2917